Of Counsel:
CLAY CHAPMAN IWAMURA PULICE & NERVELL

GERALD S. CLAY          #1439
SCOTT I. BATTERMAN      #5017
Topa Financial Center
700 Bishop Street, Suite 2100
Honolulu, Hawaii 96813
Telephone: (808) 535-8400

Attorneys for Plaintiffs

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| JAMES H. JOHNSTON and JUDY HILLER GIVENS,<br><br>Plaintiffs,<br><br>vs.<br><br>SIGMA FINANCIAL CORP. and GRANT MICHAEL WOOD,<br><br>Defendants. | CIVIL NO. 15-1-2452-12   G W B C<br>(Other Civil Action)<br><br>COMPLAINT; EXHIBIT 1; SUMMONS |

## COMPLAINT

COME NOW Plaintiffs JAMES H. JOHNSTON and JUDY HILLER GIVENS ("Plaintiffs"), by and through their attorneys, Clay Chapman Iwamura Pulice & Nervell, and as and for their Complaint against Defendants above-named herein, allege and aver as follows:

### PARTIES

1.      Plaintiff JAMES H. JOHNSTON ("Mr. Johnston") is an individual residing in the County of Hawaii, State of Hawaii, and is a citizen of Hawaii.

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

Exhibit A

2.     Plaintiff JUDY HILLER GIVENS ("Ms. Givens") is an individual residing in the County of Hawaii, State of Hawaii and is a citizen of Hawaii. Mr. Johnston and Ms. Givens are hereinafter sometimes jointly referred to as "Plaintiffs."

3.     Plaintiffs are informed and believe and allege thereon that Defendant SIGMA FINANCIAL CORP. ("Sigma") is a corporation organized and existing under the laws of the State of Michigan with its principal place of business in Ann Arbor, Michigan. Sigma is a broker-dealer registered with the Financial Industry Regulatory Authority ("FINRA") and is authorized to do business in the State of Hawaii.

4.     Plaintiffs are informed and believe and allege thereon that Defendant GRANT MICHAEL WOOD ("Wood") is a natural person who is a citizen of the State of California and resides in Alamo, California. Wood is currently registered with FINRA as an associated person with a broker-dealer (CRD No. 1188491), and was formerly an associated person of Sigma at times relevant hereto.

## FACTS

### The Cooperation Agreement and Sale of the Tantalus Property

5.     Plaintiffs, brother and sister, are former owners of a vested remainder interest in real property (land and a house constructed thereon) located at 2643 Tantalus Drive, Honolulu, Hawaii.

6.     Plaintiffs' mother, nonparty Sigrid Grover, and sister, nonparty Kathryn Howard, also owned interests in the Tantalus property.

7.     Pursuant to a Cooperation Agreement dated June 3, 2007 (the "Cooperation Agreement"), a true and correct copy of which is attached hereto as Exhibit 1, Plaintiffs, Sigrid Grover and Kathryn Howard agreed to list the Tantalus property for sale and divide the net

proceeds of the sale, with Mr. Johnston and Ms. Givens each entitled to receive twenty percent (20%) of the net proceeds, Ms. Howard to receive twenty-one percent (21%), and Ms. Grover to receive thirty-nine percent (39%) of the net proceeds.

8.      The Cooperation Agreement further contemplated that Plaintiffs would invest their shares of the net proceeds of the sale of the Tantalus property in an eligible income-generating property as a tax-deferred exchange under Section 1031 of the Internal Revenue Code. Ms. Grover would invest two-thirds of her share of the proceeds, after taking advantage of her $500,000 one-time homeowner capital gains exemption, in the same property.

9.      Pursuant to the Cooperation Agreement, the replacement property acquired pursuant to the 1031 exchange would be titled in the name of Ms. Grover as life tenant, and Plaintiffs as remainderman as tenants in common in equal shares. Ms. Grover would receive all net income from the replacement property for life.

10.     After executing the Cooperation Agreement, the parties thereto successfully sold the Tantalus property for $1,595,000. Of this sum, Plaintiffs were each to receive $295,494.70 net of expenses.

*Nature of Tenancies In Common (or "TICs")*

11.     Tenancies in Common ("TICs") are securitized placement real estate investments that can be sold to investors for the purpose of deferring capital gains tax under Section 1031 of the IRS code. The "tenancy-in-common" or "TIC" refers to a fractional interest in an undivided real estate property.

12.     A TIC sponsor purchases the same types of commercial real estate property that real estate investment trusts ("REITs") purchase. However, unlike REIT investors, TIC

investors directly own a fraction of the property and assume a proportionate amount of the loan used to purchase the property.

13.     This means that TIC purchasers (including Plaintiffs) may become personally liable for considerable amounts of debt.

14.     TICs are sold through private placement offerings that are exempt from registration under Regulation D.  As such, TIC sponsors do not need to comply with the typical registration requirements of the Securities Act of 1933 that apply to most issuers of securities.

15.     TICs are also unique in that they qualify for tax-free, like-kind, exchanges of property under Section 1031 of the IRS code of 1986.

16.     A "like-kind exchange," also known as a 1031 exchange, permits owners of investment property to defer capital gains tax upon the disposition of investment property if proceeds from the sale are re-invested in other investment property within specified time limits.

17.     Under Section 1031 of the Internal Revenue Code, a seller wishing to engage in a like-kind exchange has only 45 days from the sale of the original property to identify a "like-kind" replacement property and 180 days from the date of the sale to close on the purchase of the replacement property.

18.     Due to these time limitations prescribed by the IRS, investors have a short amount of time to conduct due diligence on replacement properties.  In these circumstances, it is especially important to have a third party, such as a broker-dealer, engage in this due diligence.

19.     Under a 2002 IRS Revenue Ruling (Rev. Ruling 2002-22), applicable to like-kind exchanges, investors are permitted to exchange singular interests in real property with TICs.  This ruling resulted in a spike in TIC transactions by investors wishing to delay payment of capital gains taxes on real estate during the early 2000s.

20.     TICs are typically characterized by lack of liquidity, little price transparency, and extremely high fees and distributions that may be paid from offering proceeds. Further, TIC investors remain personally liable on the underlying debt for their TIC investments unless they invest via a limited liability corporation or other business organization.

21.     Investors are induced into investing in TICs, including the ones at issue in this case, in order to defer capital gains that may be realized from the sale of an investment property.

22.     While the marketing materials for TICs emphasize that TIC investors can earn a steady income stream on the untaxed proceeds of their exchanges, much of the tax deferral is often lost in upfront fees paid to the entities involved in the offering. In this case, over $1 million of the capital contributed to each of the subject TICs was consumed in sales commissions and fees paid to Sigma and/or its affiliates.

*FINRA's Guidance Concerning TIC Investments*

23.     When TICs are offered and sold together with other arrangements, they generally constitute investment contracts (*i.e.,* any contract, transaction or scheme in which persons invest their money in a common enterprise with the expectation of profits to be derived predominantly from the efforts of others). *See SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946).

24.     FINRA Notice to Members ("NTM") 05-18 reminds its members that when offering TIC interests that are securities to customers, members and their associated persons must comply with all applicable NASD rules, including those addressing suitability, due diligence, splitting of commissions, supervision and record keeping.

25.     According to NTM 05-18, before recommending a TIC, a broker must consider whether "the fees and expenses associated with TIC transaction outweigh the potential

tax benefits to the customer. TICs structured with high up-front fees and expenses paid to the sponsor and/or salespersons of the selling broker-dealers raise particular concerns about the ability to make a suitable recommendation."

26. TICs are also illiquid with no known secondary market according to FINRA.

27. Furthermore, NTM 05-18 discusses member obligations when selling TICs. 05-18 cautions members when selling TICs that make up a large portion of the client's assets. It urges members to "consider the risks from over-concentration against the benefits of tax deferral and the investment potential of the underlying real estate asset(s)." *Id.*

***Defendants Recommend That Plaintiffs Make Unsuitable Investments In Tenancies in Common Known as Mission Millbrook, DST and Mission Antioch, DST***

28. As Plaintiffs and Ms. Grover prepared to close on the sale of the Tantalus property, Plaintiffs needed to identify a replacement property promptly so that they could effectuate the 1031 exchange called for in the Cooperation Agreement.

29. Ms. Givens spoke with several agents concerning possible 1031 exchange properties. She discussed possible TIC investments with Defendant Wood, who held himself out as an experienced professional with significant experience with 1031 exchanges and TICs.

30. In initial discussions with Mr. Wood, Ms. Givens explained her financial situation and also that of Mr. Johnston. Ms. Givens, an attorney, had substantial net worth of about $1.8 million and annual income of about $500,000. Mr. Johnston, a carpenter, had a modest annual income and very modest savings, and the sums he received in connection with the sale of the Tantalus property represented the substantial majority of his net worth.

31. Plaintiffs further indicated to Mr. Wood that they were both conservative investors who prioritized preservation of capital in approaching the investment of the proceeds

- 6 -

from the sale of the Tantalus property. Both Mr. Johnston and Ms. Givens related the basic facts concerning their background, financial circumstances, goals and risk tolerance in separate telephone conversations with Mr. Wood.

32.     After discussing Plaintiffs' background, financial circumstances and risk tolerance, Mr. Wood indicated that he was familiar with two TICs that he strongly recommended - one located at 6200 Riese Drive, Raleigh, North Carolina known as "Mission Millbrook", and a second located at 100 Hickory Highlands Drive, Antioch, Tennessee known as "Mission Antioch". Defendant Wood indicated that he regarded these two TICs as very good investment opportunities for Plaintiffs because they would provide a steady stream of income from existing tenants while providing a safe investment of Plaintiffs' principal, and also offering an opportunity for capital appreciation over the longer term.

33.     In inducing the Plaintiffs to purchase the subject TICs, Sigma, per Mr. Wood, further made misrepresentations of material facts, including but not limited to representations:

- That the Mission Millbrook and Mission Antioch investments had undergone a rigorous due diligence process;

- That the Mission Millbrook and Mission Antioch investments were safe, secure and conservative investments;

- That the Mission Millbrook and Mission Antioch investments would yield a steady rate of return in the form of lease payments from existing lessees;

- That the investments were suitable investments for the Plaintiffs;

- That the rents on the Mission Millbrook property were increasing; and

- That Defendants expected the Mission Millbrook property to appreciate at 12-16% per year.

- 7 -

34.    Defendants also omitted to state crucial material facts concerning the Mission Millbrook and Mission Antioch investments, including:

- Failure to disclose that the investments were highly speculative and entailed a significant risk of loss of principal;

- Failure to disclose that the investments were not suitable investments for the Plaintiffs;

- Failure to disclose that the Defendants had not conducted adequate due diligence (and had not conducted any independent due diligence) on the Mission Millbrook and Mission Antioch properties;

- Failure to disclose that Defendant Sigma had completely outsourced its due diligence with respect to Mission Millbrook and Mission Antioch to its Walnut Creek, California branch office;

- Failure to disclose that Sigma, and in particular its Walnut Creek branch office, participated in virtually every TIC or DST offering sponsored by Mission;

- Failure to disclose that Sigma was the sole soliciting broker dealer in multiple Mission Residential TIC/DST offerings (including Mission Millbrook).

35.    By making misleading statements and neglecting to make key material disclosures, Defendants induced the Plaintiffs to purchase the Mission Millbrook and Mission Antioch TICs. Plaintiffs relied upon the promises and representations made by the Defendants and further relied upon the Defendants to disclose all material facts to them.

***Plaintiffs' Transactions in the Mission Millbrook and Mission Antioch TICs***

36.    After the sale of the Tantalus property, the proceeds were paid into an escrow account with a title company in Hawaii (minus $500,000 paid to Ms. Grover).

37.    Thereafter, in connection with the contemplated 1031 exchange, Plaintiffs' share of the proceeds from the sale of the Tantalus property were transferred by the Hawaii title company to a qualified intermediary, First Nationwide Exchange, Inc., in Honolulu. First

Nationwide Exchange, Inc. later transferred Plaintiffs' funds to Stewart Title Guaranty Co. in Charlotte, North Carolina to complete the purchase of the subject TICs.

38. Plaintiffs purchased interests in the subject TICs as follows:

a. <u>Mission Millbrook</u>: $479,000 investment (representing a 4.673% fractional interest) plus assumption of $887,902.49 in debt.

b. <u>Mission Antioch</u>: $506,000 investment (representing a 3.1% fractional interest) plus assumption of $968,539.73 in debt.

### *Plaintiff Johnston Was Not An Accredited Investor*

39. Accredited investor is a defined term under Rule 501 of Regulation D ("Reg D"), the exemption from registration under which the subject TICs were sold. The term "accredited investor" is used throughout Reg D to determine which securities issuances are exempt from the registration of Section (4)(a)(2) of the Securities Act.

40. Specifically, an accredited investor is any individual who either has a net worth of $1,000,000 or annual income of $200,000 individually or $300,000 jointly with their spouse.

41. As Plaintiffs clearly communicated to Defendants, Mr. Johnston had nowhere near a net worth of $1 million or an income of $200,000 annually. Mr. Johnston was therefore not an accredited investor under Reg D and was not eligible to invest in Mission Millbrook.

### *The FINRA AWC*

42. In October 2014, Sigma entered into a FINRA Letter of Acceptance Waiver and Consent ("AWC"), agreeing to a censure and fine of $185,000 for having deficient supervisory systems and procedures.

- 9 -

43.     The AWC also found that Sigma engaged in deficient supervision of registered representatives' activities, deficient processes and procedures for determining suitability, deficient procedures relating to customer information, and deficient procedures regarding OSJ registration and failure to perform due diligence on private placement offerings sold by its representatives.

44.     FINRA Rule 3010 requires members to have a system in place to supervise the sales activities of their registered representatives. Rule 3010 requires that each member ensure that transactions with customers are reviewed and in instances approved by a Supervisor/Principal of the Member. By permitting its representatives to sell unsuitable and risky TICs to Plaintiffs, Defendant Sigma clearly failed to carry out its supervisory obligations.

45.     As a result of the Defendants' wrongful actions and inactions set forth in part above, Plaintiffs have suffered and continue to suffer damages, including but not limited to loss of principal, loss of income, attorneys' fees and costs.

### FIRST CLAIM FOR RELIEF
### VIOLATION OF STATE SECURITIES LAWS

46.     Plaintiffs repeat and reallege each allegation above as though fully set forth herein.

47.     Defendants violated multiple sections of the California Corporate Securities Law of 1968 ("CCSL"), Cal. Corp. Code § 25000 *et seq.* Under the CCSL, it is unlawful to:

> (d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading.[1]

48.    Hawaii's Uniform Securities Act, Haw. Rev. Stat. § 485A-501 ("HUSA") contains similar proscriptions as follows:

(a) It shall be unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:

(1) To employ a device, scheme, or artifice to defraud;

(2) To make an untrue statement of a material fact or to fail to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person;

(4) To issue, circulate, or publish any prospectus, circular, advertisement, printed matter, document, pamphlet, leaflet, or other literature (in this chapter collectively referred to as "advertising matter"), which contains an untrue statement of a material fact or fails to state a material fact necessary to make the statements therein made, in light of the circumstances under which they are made, not misleading;

49.    The conduct of Defendants directly violated the CCSL and HUSA. The aforementioned practices, representations and omissions by the Defendants tended to work a fraud and involved statements that lacked reasonable grounds, and also constituted fraudulent and deceitful practices.

50.    Wood (while acting in his capacity as an agent of Sigma) obtained money by way of untrue statements of material facts.

---

[1] See Cal. Corp. Code § 25400(d); see also Cal. Corp. Code § 25401(regarding oral misrepresentations in connection with sale of securities) and § 25216 (stating that a violation of the CCSL occurs when a broker-dealer or agent sells a security "by means of any manipulative, deceptive or other fraudulent scheme, device, or contrivance"). One who violates the CCSL is subject to civil liability pursuant to Cal. Corp. Cod § 25500 and § 25501.

51.     Plaintiffs reasonably relied on the acts, practices, representations and omissions made by Defendants.

52.     As a direct and proximate result of Defendants' violation of the CCSL and the HUSA, Plaintiffs suffered damages in an amount to be determined according to proof.

## SECOND CLAIM FOR RELIEF
### FRAUD

53.     Plaintiffs repeat and reallege each allegation above as though fully set forth herein.

54.     Defendants informed and solicited Plaintiffs to invest in the subject TIC investments based on the misrepresentations and omissions set forth in ¶¶ 35-36 above.

55.     As a result of misrepresentations and omissions of material facts made by Defendants to Plaintiffs, Plaintiffs were induced to invest in the subject TICs to their detriment.

56.     The representations made to Plaintiffs about investment in the subject TICs, including the representations regarding the safety of Plaintiffs' principal, were false.

57.     Each of the misrepresentations and omissions made by Defendants was committed in violation of their duties as the broker and agent of the Plaintiffs. Defendants knew or should have known that these representations were false at the time they were made and at all times herein mentioned.   Defendants made misrepresentations about the risks involved in investing in the TICs and the safety of Plaintiffs' principal with the intent of inducing Plaintiffs to invest in the TICs and with the intent of defrauding and deceiving Plaintiffs, for the express purpose of obtaining commissions and fees from the Plaintiffs' investment in the TICs.

58.     The misrepresentations and omissions made by Defendants were material to Plaintiffs' investment decisions. But for the misrepresentations made by Defendants, Plaintiffs would not have invested in the alternative investments.   Further, Defendants also fraudulently

- 12 -

concealed from Plaintiffs numerous material facts, including without limitation the facts alleged at ¶ 34 above.

59.     Defendants intentionally made their misrepresentations knowing them to be false or without believing them to be true, or made their representations recklessly without knowing whether they were true or false. Based on the representations and in justifiable reliance on the misrepresentations, Plaintiffs consented to invest in the subject TICs, held the investments, and refrained from taking legal or other action to assert their rights.

60.     Plaintiffs were justified in relying on the representations of Defendants because of the Defendants' purported expertise in investing as well as the trust and fidelity Defendants owed to Plaintiffs as their broker and agent.

61.     As a proximate result of the fraudulent conduct of the Defendants as herein alleged, Plaintiffs were damaged in an amount to be determined according to proof.

## THIRD CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY

62.     Plaintiffs repeat and reallege each allegation above as though fully set forth herein.

63.     Defendants are persons who, for compensation, engage in the business of advising others as to investing in, purchasing and selling securities. Defendants acted as agents of and fiduciaries to Plaintiffs and owed fiduciary duties to Plaintiffs, including without limitation duties of care, candor and loyalty of the highest good faith and fair dealing, under the common law.

64.     It is well established that a stockbroker owes a fiduciary duty of care and loyalty to its customers. Likewise, the SEC has held that a fiduciary relationship exists between a brokerage firm and its customers. According to the SEC, the common law doctrine of agency and

the rules of self-regulatory organizations, such as FINRA, give rise to the fiduciary duty owed by brokers. *See In re E.F. Hutton & Co., Inc.* Exchange Act Release No. 25,887 [1988-89 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,303 (July 6, 1988) ("The concept of just and equitable principals of trade embodies basic fiduciary responsibilities....")

65.     It is well-settled that the fiduciary responsibilities of a broker include:

a.     The duty to recommend investments only after studying them sufficiently to become informed as to their nature, price, and financial prognosis;

b.     The duty to carry out the customer's orders promptly and in a manner best suited to serve the customer's interests;

c.     The duty to inform the customer of all the risks involved in purchasing or selling a particular security;

d.     The duty to refrain from self-dealing;

e.     The duty not to misrepresent any material fact to the transaction; and

f.     The duty to transact business only after receiving authorization from the customer.

66.     Defendants breached their fiduciary duties to Plaintiffs by misrepresenting the nature and risks of the subject TICS, failing to disclose the inherent risks of the investments, and by proposing unsuitable investments.  Plaintiffs relied on Defendants' superior expertise in the securities markets when purchasing the TIC investments.

67.     Plaintiffs were damaged and injured in their property due to Defendants' conduct and omissions.

### FOURTH CLAIM FOR RELIEF
### CONSTRUCTIVE FRAUD

68.     Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

- 14 -

69.     As a result of their misrepresentations and omissions and the other wrongful conduct alleged herein, Defendants, in direct violation of their fiduciary duties to Plaintiffs, took improper advantage of the fiduciary relationship existing among the Defendants and the Plaintiffs at the expense of the Plaintiffs who relied on the Defendants' expertise.

70.     The breach of a fiduciary duty constitutes constructive fraud.  Plaintiffs placed trust and confidence in Defendants' honesty and integrity to handle their investments and relied upon Defendants' superior experience and knowledge in the securities industry to satisfy these duties.  As noted above, these duties, including the duty to monitor and timely disclose all material information regarding the subject TIC investments, were ongoing throughout the duration of Defendants' relationship with the Plaintiffs.

71.     Defendants' actions have resulted in an unconscionable advantage being taken by the Defendants over the Plaintiffs, and the Plaintiffs have suffered damages resulting therefrom.

72.     Defendants' abuse of the fiduciary relationships existing among the parties was accomplished in bad faith, through the use of intentional deceit and deception, and in reckless disregard of Plaintiffs' rights for the Defendants' own financial gain.

### FIFTH CLAIM FOR RELIEF
### BREACH OF CONTRACT

73.     Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

74.     Defendants entered into professional service arrangements with Plaintiffs to offer investment advice and, specifically, to advise Plaintiffs concerning investments suitable in light of their investment objectives and life circumstances.  Additionally, Defendants were

obligated by contract to abide by all applicable National Association of Securities Dealers and FINRA regulations.

75.     In undertaking their contract performance, Defendants represented to Plaintiffs that they were skilled and experienced financial advisors and would provide advice in connection with Plaintiffs' investments.

76.     Plaintiffs paid Defendants the fees charged in accordance with their arrangement.

77.     Defendants were required to perform under the arrangement in good faith and in accordance with professional standards and applicable regulations.

78.     Defendants breached the professional service arrangement by virtue of the conduct and omissions alleged herein and due to their violations of FINRA and NASD rules.

79.     Plaintiffs were injured by Defendants' breaches of contract.

**SIXTH CLAIM FOR RELIEF**
**AGENCY LIABILITY**

80.     Plaintiffs repeat and reallege each allegation above as though fully set forth herein.

81.     As Defendant Sigma's representative, Mr. Wood sold Plaintiffs these unsuitable investments, and otherwise breached duties to Plaintiffs.   Wood's conduct was performed within the scope and course of his employment.   In connection with the sale and purchase of securities, he directly performed services on behalf of Defendant Sigma.   Therefore, Defendant Sigma directly and/or indirectly induced the facts set forth above, and Defendant Sigma is vicariously liable for the acts of its agent Wood under the principle of *respondeat superior*.

## SEVENTH CLAIM FOR RELIEF
## UNFAIR AND DECEPTIVE TRADE PRACTICES

82.     Plaintiffs repeat and reallege each allegation above as though fully set forth herein.

83.     Plaintiffs, as individuals who invested money in a personal investment, are consumers within the meaning of Chapter 480 of the Hawaii Revised Statutes.

84.     The actions of Defendants were unfair and deceptive and constituted an unfair and deceptive practice within the meaning of Chapter 480 of the Hawaii Revised Statutes, because, *inter alia,* they were based on false statements and failures to disclose, and improper sales practices.

85.     As a result of Defendants' actions, Plaintiffs have been injured in an amount to be determined at trial, and are entitled to the remedies provided for by Section 480-13 of the Hawaii Revised Statutes, including but not limited to, treble damages, interest and attorneys' fees.

## FRAUDULENT CONCEALMENT

86.     Defendants concealed the wrongful conduct alleged herein.  Plaintiffs only recently discovered the true facts concerning the subject TIC investments, and could not have discovered them and brought legal action sooner in the exercise of reasonable diligence.

87.     Due to the fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs have been tolled during the period of such fraudulent concealment.

## JURY DEMAND

88.     Plaintiffs demand a trial by jury on all claims so triable.

- 17 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

a.      That process issue out of this Court summoning Defendants to answer this Complaint as provided for by law.

b.      That the Court award Plaintiffs compensatory and punitive damages and/or treble damages in a sum to be established at trial and/or rescind the subject transactions.

c.      That the Court award Plaintiffs their costs and attorney's fees, together with pre and post-judgment interest.

d.      That Plaintiffs be awarded such other and further relief as is just and equitable under the law.

DATED:  Honolulu, Hawaii, December 28, 2015.

GERALD S. CLAY
SCOTT I. BATTERMAN
Attorneys for Plaintiffs

- 18 -

ONE OF 2

## COOPERATION AGREEMENT

This Agreement is dated June 3, 2007. The parties to this Agreement are Sigrid Grover ("Sigrid"), Kathryn Howard ("Kathryn"), Judy Hiller Givens ("Judy") and James Johnston ("James").

### Background

a.     The parties own land and a house at 2643 Tantalus Drive, Honolulu, Hawaii, designated by Tax Key Number (1) 2-5-008-023 (the "Property"). Kathryn owns an undivided 1% fee simple interest in the Property. Sigrid has a life estate in 99% of the Property for the duration of her natural life, and Judy and James each have a 33-1/3% remainder interest and Kathryn has a 32-1/3% remainder interest in the Property. Title to the property is subject to a mortgage (the "Mortgage").

b.     The parties wish to cooperate to try to sell the Property by private sale if such a sale can be accomplished in a reasonable time.

c.     If the Property can be sold by private sale, the parties wish to agree in advance on the distribution of the proceeds.

NOW, THEREFORE, in consideration of the foregoing and in consideration of the mutual promises stated below, the parties mutually agree as follows:

1.     Listing for Sale.  The parties shall cooperate in listing the Property for sale. Judy shall be responsible to engage a real estate broker, and all parties shall enter into a listing agreement for the sale of the Property.  Judy and James may establish the listing price for sale of the Property by private sale and may adjust the listing price from time to time.  Sigrid shall cooperate in showing the Property by appointment and by open houses that the broker may choose to conduct.  The commission payable to the broker shall not exceed 6% of the sale price.  The listing period shall not extend beyond September 15, 2007.

2.     Allocation of Sales Proceeds from a Private Sale.  If the Property is by private sale, costs to be deducted from the proceeds before any division occurs among the parties shall include: the broker commission, customary closing costs and prorations typically chargeable to the seller in a residential sale, and attorney fees and accounting fees up to $1,500.00 incurred in preparing this Agreement and in rendering services incident to contract negotiation and closing with the buyer and incident to arranging and implementing any Section 1031 tax-deferred exchange that may result from the sale. The net proceeds after such deductions shall be allocated as follows:

12-1/3% to Sigrid, from which the Mortgage will be satisfied and the balance will be retained outright by Sigrid.   Sigrid intends to claim a residence exemption for this amount;

21 % to Kathryn unrestricted.  Kathryn intends to claim a residence exemption for this amount;

ImanageDB:708104.1

## EXHIBIT 1

Two of 2

26-2/3% to Sigrid.   Sigrid intends to claim a residence exemption for this amount and then intends to invest it, as life tenant for her natural life, in property to be identified by Judy and James in a Section 1031 exchange as provided below; and

20% each to Judy and James for investment as provided below.  Judy and James intend to devote their shares to a Section 1031 exchange.

3.    Tax-deferred Exchange.  The 66-2/3% of the net proceeds allocable to Sigrid, Judy and James and slated for investment as provided above, shall be invested as provided below to generate income to Sigrid for her life and thereafter the principal amount of the investment and any subsequent income shall belong half to Judy and half to James as follows:

Sigrid's 26-2/3% of the net proceeds identified above will be invested in property to be identified by Sigrid, Judy and James.  Judy's and James' collective 40% of the net proceeds will be invested in the same property as a tax-deferred exchange under Section 1031 of the Internal Revenue Code.  The exchange property will be an eligible income-producing replacement property. All of the income from such replacement property, net after the out-of-pocket expenses of owning and tenanting the property, will be paid to Sigrid for the rest of her natural life.  All real property so acquired shall be titled in the name of Sigrid as life tenant and in the names of Judy and James as remaindermen as tenants in common in equal shares.

4.    Miscellaneous.  This Agreement may be signed in counterparts, which together shall constitute one Agreement.  Signatures on this Agreement transmitted by facsimile or other electronic means shall be valid.

Signed:

_Sigrid K. Grover_
Sigrid Grover
                                              ("Sigrid")

_Judy Hiller Givens_
Judy Hiller Givens
                                              ("Judy")

_GC_
Kathryn Howard
KATHRYN M. HOWARD      ("Kathryn")

_James Johnston_
James Johnston
                                              ("James")

ImanagDB:708104.3

| STATE OF HAWAI'I<br>CIRCUIT COURT<br>OF THE FIRST CIRCUIT | SUMMONS<br>TO ANSWER CIVIL COMPLAINT | CASE NUMBER<br><br>CIV. # |
|---|---|---|

| PLAINTIFF,                                VS.<br>JAMES H. JOHNSTON and JUDY HILLER GIVENS | DEFENDANT.<br>SIGMA FINANCIAL CORP. and GRANT MICHAEL WOOD |
|---|---|
| PLAINTIFF'S ADDRESS (NAME, ADDRESS, TEL. NO.)<br>Gerald S. Clay #1439; Scott I. Batterman #5017<br>700 Bishop Street, Suite 2100<br>Honolulu, Hawaii 96813<br>Telephone:  (808) 535-8400 | |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

GERALD S. CLAY, ESQ. and SCOTT I. BATTERMAN, ESQ.
_____ ,
plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| DATE ISSUED<br><br>DEC 2 8 2015 | CLERK<br><br>N. ANAYA | FIRST CIRCUIT COURT<br>SEAL<br>STATE OF HAWAII |
|---|---|---|
| I do hereby certify that this is full, true, and correct copy of the original on file in this office | Circuit Court Clerk | |

In accordance with the Americans with Disabilities Act and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the First Circuit Court Administration Office at PHONE NO. 539-4333, FAX 539-4322, or TTY 539-4853, at least ten (10) working days prior to your hearing or appointment date.

Reprographics (07/11)   RevaComm 508 Certified                                    SUMMONS TO ANSWER CIVIL COMPLAINT  1C-P-787